## DAVIS v. SOUTHERN PAC. CO.

(District Court, N. D. California, Second Division. July 15, 1916.)

No. 15710.

1. CONTRACTS ⚖➺108(1)—ENFORCEMENT—PUBLIC POLICY.

The courts will not enforce a contract opposed to public policy.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 498; Dec. Dig. ⚖➺108(1).]

2. CARRIERS ⚖➺35—AGREEMENT TO REFUND LOCAL FREIGHT CHARGES—VIOLA-TION OF INTERSTATE COMMERCE ACT.

A railroad's agreement, offered to all California hop growers, if they would ship by its line, to reimburse them for all local freight charges necessary to transport the hops to shipping points, and also storage charges, and, if the growers would use the road's rail and water route, to reimburse them for marine insurance, was violative of Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 379, § 6, as amended March 2, 1889. c. 382, 25 Stat. 855, § 1 (Comp. St. 1913, § 8569), and of the Elkins Act Feb. 19, 1903, c. 708, 32 Stat. 847 (Comp. St. 1913, §§ 8597–8599), prohibiting rebates from published tariffs, concessions, or discrimination by common carriers.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 94; Dec. Dig. ⚖➺35.]

3. COURTS ⚖➺96(1)—DECISIONS OF SUPREME COURT—EFFECT IN DISTRICT COURT.

A decision of the United States Supreme Court is controlling on the District Court in determining whether a railroad's contract with hop growers to transport hops at a lesser rate than the road's published tariff is violative of the Interstate Commerce Act.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 325, 327, 334; Dec. Dig. ⚖➺96(1).]

4. CARRIERS ⚖➺35—REGULATION OF RATES—CONTRACTS—STATUTORY PROHIBITION.

A contract by a carrier contrary to express provision of law prohibiting rebates, concessions, and discrimination, and opposed to public policy as declared by the supreme legislative authority of the country, cannot be enforced in any court.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 94; Dec. Dig. ⚖➺35.]

5. CONTRACTS ⚖➺138(1)—ILLEGALITY.

With respect to unperformed features of a contract illegal as contrary to express provision of law and opposed to public policy, the court will leave the parties where it finds them.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 681, 687; Dec. Dig. ⚖➺138(1).]

Suit by Ralph Davis against the Southern Pacific Company. Judgment for defendant.

Plaintiff, as the assignee of Philip Wolf & Co., C. C. Donovan, and Herman Klaber & Co., brought suit against the Southern Pacific Company for the total sum of $4,621.16, with legal interest thereon from appropriate dates, under the terms of alleged agreements had and made with the defendant, that it would pay the above aggregate sum to plaintiff's respective assignors.

Counsel for plaintiff in his brief states that: "The following facts stand proved in this case either by uncontradicted testimony of the witnesses, adduced at the trial thereof, or by the admissions of the pleadings:

"Defendant corporation, during the period within which the claims of plaintiff's assignors arose, and long prior thereto, and all antecedent to the

passage of the so-called Hepburn Act, offered to and did agree with all dealers in hops in the state of California, without distinction or discrimination, firstly, that upon all interstate shipments from points of delivery in California to points east of the Missouri river, and upon full payment of the legal tariff rate therefor, it would reimburse said dealers in the amount of any local freights advanced or paid by them to transport the hops to said points of delivery, together with all proper warehouse and cartage charges incurred in the assembling thereof; and, secondly, that in the event such hops were shipped to Atlantic points, either directly or in transit to Europe over defendant's Sunset route, a rail and water route instead of all rail, it would reimburse said dealers in the amount of the excess insurance charge upon freight shipped by said Sunset route over and above the insurance charge on the same freight shipped all rail.

"It is a proved fact that the defendant corporation, during all the times aforesaid, was engaged in intrastate business, but that all of the hops shipped by plaintiff's assignors were not shipped alone upon defendant's intrastate lines, but also upon the lines of other intrastate railroads.

"It is a proved fact that at all of the foregoing times the Santa Fé Railroad was an independent transcontinental or interstate carrier and a competitor of the defendant corporation, with its California terminal at San Francisco; that said Santa Fé Railroad had no intrastate lines and that said Santa Fé Railroad maintained and established warehouses of its own at different terminal points; and that in competition with defendant corporation, and in furtherance thereof, it made the same offer to and agreement with dealers in hops generally in the state of California upon which the claim of plaintiff is predicated.

"It is a proved fact that the all-rail route from point of origin in California to an Atlantic Seaboard terminal, via defendant's road, required the services of connecting carriers and a consequent division of the freight rate exacted in consonance with the tariff; that the so-called Sunset route was owned entirely by the Southern Pacific; and that said all-rail route via Southern Pacific was in fact a competitor with the defendant corporation's Sunset route in and for the shipment of freight from point of origin in California to points upon the Atlantic seaboard.

"It is a proved fact that plaintiff's assignors Philip Wolf & Co., one of said dealers in hops, did during the years 1905–1906, and prior to the going into effect of the Hepburn Act, make numerous shipments over defendant's line from California to points east of the Missouri river, relying upon and in acceptance of the offer of defendant corporation to reimburse Philip Wolf & Co. in the amount of local charges, cartages and storages by Philip Wolf & Co., expended upon and in the assembling of said shipments at point of delivery to defendant corporation for interstate shipment; that said Philip Wolf & Co. did actually pay the full tariff rate upon all of said shipments; and that the admitted amount paid by Philip Wolf & Co. for such local freights (all necessary intrastate), cartages, and storages was the sum of $1,342.17, and that claim therefor was duly filed with defendant corporation on the 6th day of March, 1907.

"It is a proved fact that plaintiff's assignor C. C. Donovan (one of said dealers in hops) did, during the period aforesaid and prior to the effective date of the Hepburn Act, ship numerous consignments of hops over defendant's interstate line from California to points east of the Missouri river in reliance upon and in acceptance of the aforesaid offer and agreement of defendant corporation; that said C. C. Donovan did actually pay the full tariff rate upon all of said shipments, and did pay storage charges in the assembling thereof; and that the admitted amount paid by said C. C. Donovan for such storages was the sum of $941.05, and that claim therefor was duly filed with defendant corporation on or before the 1st day of January, 1907.

"It is a proved fact that the firm of Philip Wolf & Co., plaintiff's assignor, during the period aforesaid, and when said offer and agreement to absorb the excess of insurance charges by defendant's Sunset route over said charges by its all-rail route was in full force and effect, and so generally made to dealers in hops, did ship various consignments of hops over the Sunset route

of defendant to Atlantic ports in transit to Europe, and did pay the full tariff rate therefor; that it did carry insurance upon said consignments; that the amount of the excess premium paid by said Philip Wolf & Co. was the sum of $570.70; and that claim therefor was made upon and filed with defendant corporation prior to the 18th day of March, 1909.

"It is a proved fact that none of the amounts admittedly due under the agreements aforesaid have been repaid to plaintiff or his assignors.

"*Finally, it is admitted that the aforesaid concession granted all dealers in hops, and plaintiff's assignors in common with them, were not stated in the tariff schedules published by the defendant corporation during the period aforesaid.*" Italics mine.

The complaint contains three causes of action covering the three different assignments referred to, and allegations of the different causes of action are all substantially in the same form. The ones in the first cause of action material to a consideration of the issues presented are as follows:

"That during all the times hereinafter mentioned and until the dissolution thereof as hereinafter set forth, Philip Wolf & Co. was a copartnership, the partners of which were Philip Wolf, Max Wolf, and M. J. Netter, with its principal place of business in the city and county of San Francisco, state of California, and engaged in the business of buying hops from the producers thereof in said state of California and elsewhere and selling said hops to purchasers located in different portions of the United States outside of said state of California and in Europe, and that in and by the terms of said sales said Philip Wolf & Co. was required to transport said hops to the respective places of business of said purchasers outside of said state of California.

"That in addition to said copartnership of Philip Wolf & Co. there were numerous other persons and firms during all the times hereinafter mentioned engaged in the business of buying hops produced in said state of California and in selling the same to purchasers at various points outside of the state of California, and such other dealers also were required to transport said hops to the places of business of their said customers outside of the state of California and to there deliver them.

"That said defendant was anxious to procure from said Philip Wolf & Co. and said other dealers in hops during the period of time hereinafter mentioned the business of transporting said hops from the state of California to various localities outside of said state and east of the Missouri river and to which localities said Philip Wolf & Co. and said other dealers were required to deliver said hops, as aforesaid; and as an inducement to said Philip Wolf & Co. and to said other dealers to intrust the transportation of said hops between said state of California and points east of the Missouri river to it, said defendant did make the following offer unto them: Said defendant did agree, during all the period of time during which the claims hereinafter specified arose, to and with said Philip Wolf & Co. and all other persons, firms, or corporations in the state of California engaged in a like business, that if said Philip Wolf & Co. and such other dealers would intrust to said defendant, at the regular tariff therefor, for transportation between the state of California and any point east of the Missouri river, the various shipments of hops they were required to deliver east of said Missouri river, it would reimburse said Philip Wolf & Co. and all such other dealers in the amount of any local freights which said Philip Wolf & Co. and such other dealers would advance and pay to transport the hops constituting and embraced in such shipments from the fields in California to points of delivery to said defendant in California, as well as all warehouse charges arising out of the assembling thereof at said points of delivery for shipment, and all cartage charges to and from the warehouses; and did further agree, in the case of hops shipped to Atlantic ports, either directly or in transit to Europe, that if preference were given defendant's Sunset route, which route included water transportation from Galveston, Texas, to divers Atlantic ports, over its all-rail route, it would reimburse said Philip Wolf & Co. and all such other dealers in the difference between the cost of marine insurance and railroad insurance actually expended by said Philip Wolf & Co. and such other dealers.

"That said Philip Wolf & Co. did accept the aforesaid offer of said defendant and did in pursuance thereof and during the years 1905 to and including

1906, ship numerous consignments of hops over the lines of said defendant from the state of California to points east of the Missouri river, and in connection with said shipments did expend for local freights, cartages, and storages the sum of two thousand and four hundred and nineteen dollars and fifty-four cents ($2,419.54); and for which amount said Philip Wolf & Co. did make demand upon said defendant for reimbursement in accordance with its said agreement, immediately after the respective disbursements were made and all prior to the 6th day of March, 1907; and that said Philip Wolf & Co. in further pursuance of the said offer of defendant did during the period embraced between the month of September, 1904, and the month of November, 1906, ship various consignments of hops over the Sunset Route of said defendant to Atlantic ports in transit to Europe, and by reason thereof did pay for the marine insurance covering said shipments an excess of five hundred and seventy dollars and seventy cents ($570.70) over what would have been the cost of insurance in the same amount covering said shipments had they been transported by the all-rail route of defendant; and that at various times subsequent to said payment of said marine insurance and prior to the 18th day of March, 1909, said Philip Wolf & Co. did make demand upon said defendant for reimbursement for said differential by it paid and expended between marine and rail insurance, in accordance with the agreement of said defendant."

Defendant in its answer, among other things, alleged "that it did not agree to transport said shipments from the fields to points of delivery, but did agree to transport said shipments from the railroad station near the fields to the points of delivery; and in this connection, defendant alleges that at the time of the execution of said agreement, defendant was informed and therefore believed that it was lawful to transport said shipments locally, as alleged by plaintiff, without charge therefor, but that subsequently to the execution of said agreement and the movement of said shipments as contemplated thereby defendant was informed and therefore believed and now believes that said shipments could not be moved locally by defendant without charging the full tariff rates provided by its tariffs then published."

Though the defendant company was represented by counsel at the trial it has filed no brief herein in opposition to the claim of the plaintiff; its position is very aptly expressed by its counsel in a letter to the court, in which he says: "You are correct in your assumption that the defendant's attitude is largely one of disinterestedness, and that the Southern Pacific Company is merely desirous of discharging an obligation which it voluntarily assumed."

Jacob Samuels and Oscar Samuels, both of San Francisco, Cal., for plaintiff.

C. W. Durbrow, of San Francisco, Cal., for defendant.

BLEDSOE, District Judge (after stating the facts as above). [1, 2] The legal question presented in this case can be stated in a very few words. It is this: Prior to the so-called Hepburn Act (Act June 29, 1906, c. 3591, 34 Stat. 584), and under the provisions of the Elkins amendment to the Interstate Commerce Act, was it competent for a common carrier, as an inducement to business, to enter into a valid enforceable contract with its shippers generally to transport freight in interstate commerce at a rate less than that specified in its published schedule of charges? Unless the question be answered in the affirmative, plaintiff is not entitled to recover herein, and this even though defendant be acquiescent toward such recovery, because a question of public policy is involved, and the courts will not lend their aid in the consummation of a judgment which is grounded in opposition to public policy. Beasley v. Texas & Pac. Ry. Co., 191 U. S.

492, 498, 24 Sup. Ct. 164, 48 L. Ed. 274; Harriman v. Northern Securities Co., 197 U. S. 244, 298, 25 Sup. Ct. 493, 49 L. Ed. 739. The determination of this question involves a consideration of the provisions of the Interstate Commerce Act as the same existed at the time of the transaction in question, and as amended by the so-called Elkins Act. Act Feb. 19, 1903, c. 708, 32 Stat. 847 (Comp. St. 1913. §§ 8597–8599). The portions of the statute material are appended in the margin.[1]

[1] A portion of an "Act to regulate commerce," approved Feb. 4, 1887, 24 Stat. at L. 379.

"* * * Sec. 2. That if any common carrier subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared 'to be unlawful." Comp. St. 1913, § 8564.

1. A portion of "An Act to Regulate Commerce," approved Feb. 4, 1887, as amended March 2, 1889, 25 Stat. at L. 855.

"* * * Sec. 6. That every common carrier subject to the provisions of this act shall print and keep open to public inspection schedules showing the rates and fares and charges for the transportation of passengers and property which any such common carrier has established and which are in force at the time upon its route. The schedules printed as aforesaid by any such common carrier shall plainly state the places upon its railroad between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately the terminal charges and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates and fares and charges. Such schedules shall be plainly printed in large type, and copies for the use of the public shall be posted in two public and conspicuous places, in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be accessible to the public and can be conveniently inspected. * * * And when any such common carrier shall have established and published its rates, fares, and charges in compliance with the provisions of this section, it shall be unlawful for such common carrier to charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any services in connection therewith, than is specified in such published schedule of rates, fares, and charges as may at the time be in force. * * * Every common carrier subject to the provisions of this act shall file with the commission hereinafter provided for copies of its schedules of rates, fares, and charges which have been established and published in compliance with the requirements of this section, and shall promptly notify said commission of all changes made in the same. Every such common carrier shall also file with said commission copies of all contracts, agreements, or arrangements with other common carriers in relation to any tariffs affected by the provisions of this act to which it may be a party.

"* * * It shall be unlawful for any common carrier, party to any joint tariff, to charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of persons or property, or for any services in connection therewith, between any points as to which a joint rate, fare, or charge is named thereon than is specified in the schedule filed with the commission in force at the time." Comp. St. 1913, § 8569.

1. A portion of the Elkins Act to further regulate commerce, approved Feb. 19, 1903, 32 Stat. at L. 847.

"* * * Section 1. * * * it shall be unlawful for any person, persons, or corporation to offer, grant, or give or to solicit, accept, or receive any rebate, concession, or discrimination in respect of the transportation of any property in interstate or foreign commerce by any common carrier subject to said act to regulate commerce and the acts amendatory thereto whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereto, or whereby any other advantage is given or discrimination is practiced." Comp. St. 1913, § 8597.

Much of the argument of plaintiff's counsel is devoted to a discussion of the proposition that the contracts of reimbursement relied upon herein did not constitute any "discrimination" and consequently do not contravene section 2 of the act to regulate commerce, and this because of the fact, as claimed by plaintiff and admitted by the defendant, that such contracts were entered into "with all dealers in hops in the state of California, without distinction or discrimination." It may be assumed for argument's sake that the aforesaid contracts did not in any wise violate any of the provisions of section 2 of the Interstate Commerce Act, that section, as will be observed, being of the original act of 1887, and having to do only with the general prohibition of discriminations. If, however, it be true, as I am constrained to conclude is the fact, that the contracts in question were inhibited by any one provision of the Interstate Commerce Act and thereby rendered unlawful and invalid, it is idle to inquire or to indulge in academic discussion as to whether or not they were likewise violative of some other provision of the law.

As will be noticed by the excerpts in the margin, the Elkins Act forbad any person or corporation, either to give or to receive any rebate, concession, or discrimination in respect of the transportation of property in interstate or foreign commerce by any common carrier whereby such property should by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as required by the act to regulate commerce. Section 6 of the original act made express provision for the printing and keeping open to public inspection of the schedules showing the rates and fares and charges for the transportation of passengers and property which might be established by a carrier; and it was further provided that such schedules should plainly state the places upon its railroad between which such common carrier would carry property and passengers. It was also provided in the same section that upon the establishment and publication of such rates it should thereafter be unlawful for a common carrier to charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of passengers or property, *or for any services in connection therewith,* than was specified in such published schedule then in force. Provision was also made that copies of such schedules should be filed with the Interstate Commerce Commission, and appropriate provision was made providing that changes could be made only upon due notice, etc.

We thus have two plain, unambiguous, and unequivocal declarations by the Congress of the United States in force at the time the contracts in question were entered into, the one in the original Interstate Commerce Act that no carrier should charge or receive from any shipper a greater or less compensation for the transportation of freight than that specified by it in its published charges, and the other in the Elkins Act, that no carrier on the one hand, or shipper on the other, should either give or receive any rebate or concession whereby freight should be transported at a less rate than that named in such published schedules or tariffs.

Reduced to its last analysis, and stated briefly, the proposition of the defendant railroad company in this case, which was made to these shippers, along with others, in order that it might get their business in preference to some other competitive line, was, that in consideration of their shipments from California to the East or to European markets of the products grown on their hop fields, at the rate specified in its published charges as the through rate from California to the Eastern or European markets, as the case might be, it would, on the one hand, reimburse them for all local charges in the way of local freights, cartage, warehouse, and similar charges necessary to transport such freight to the port of San Francisco, and that, on the other hand, if they would thereafter ship such freight over the rail and water route of the defendant company, as contradistinguished from its all-rail route, it would reimburse them for the extra marine insurance made necessary thereby. From whatever angle such a contract may be viewed, the net result of its performance was to enable hops to be shipped from California to the distant markets, through the medium of interstate commerce, at a less rate than that specified by the railroad company as the rate from California to such markets. The actual diminution in the rate was to be, of course, the amount necessary to be expended by the railroad company in the reimbursement of the shipper for all the local charges and for marine insurance. If this does not constitute a plain and substantial violation of the two provisions of the Interstate Commerce Act last hereinabove referred to, then I am unable to comprehend the meaning of language or to appreciate the force of valid statutory prohibitions.

The point is made, of course, all through the thread of plaintiff's argument, and is countenanced by defendant's counsel, that, because of the fact that it was open to all shippers of hops in Northern California to be the recipients of this bounty from the Southern Pacific Company, in case they saw fit to ship their products over its lines, in consequence, as adverted to hereinabove, there was and could be no discrimination, as that word is employed in the Interstate Commerce Act. In furtherance of that contention it is then urged by counsel for the defendant that:

"The primary purpose prompting the passage of the Interstate Commerce Act was to afford all shippers equal protection in shipping facilities, and in freight rates, to secure uniformity and reasonability in such rates, and to prevent unjust discrimination in favor of one shipper to the prejudice of others under substantially similar conditions of location and traffic."

It is then said that if no violation of this general purpose is to be observed, no transaction brought under review could be held to be prohibited by such act.

The answer to this contention, however, in my judgment, is that though we may concede for present purposes the general aim and intent of the act to regulate commerce was as stated by counsel, yet it is emphatically obvious that Congress, *in determining the most effective means whereby such general aim and intent might be attained,* has said, with no qualification, that shipments of the sort under consideration might not be made, save at the rate announced in the pub-

lished tariffs. It will not do then, in the face of this valid congressional declaration intended to secure at all hazards the ultimate aim of the statute, to contend that such ultimate aim having apparently in a particular case been attained, the positive mandate of the statute may nevertheless be laid out of consideration, and that, because, forsooth, no harm has actually been done. It was competent for Congress to provide ways and means whereby uniformity and equality in the matter of railroad rates might be secured to those who were .compelled to make use of public utilities. It was also competent for it, in its wisdom, to determine the means' whereby discrimination, nonuniformity, and inequality, as among shippers, might be most advantageously perpetrated. In that spirit, as a means of putting it beyond the power of a carrier to do that which might give it the opportunity of indulging in discriminatory practices, it was likewise competent for that body absolutely to prohibit the doing of those things which might become the cloak of unbridled discrimination and favoritism. This Congress has done in saying that there ,shall be no departure from the published tariffs. So it will not do, in my judgment, to say merely that as long as no discrimination apparently results, a carrier may do any and all of the things prohibited by the act. Congress has said these prohibitions are necessary, presumably to attain the end desired. It is not open to this court, then, the end apparently having been attained, to hold the prohibitions unnecessary and their enactment a futility. If the Commerce Act is to be made an efficient instrumentality in the abolition of special privileges and the equalizing of rates, which, as demonstrated by repeated amendments, has been the aim, the practices which Congress in its wisdom and competency saw proper to prohibit must be regarded at all times as being under the ban of the law.

[3, 4] These conclusions, I feel, are sustained by controlling language of the United States Supreme Court. In Armour Packing Co. v. United States, 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681, wherein the plaintiff in error was being prosecuted as for a criminal violation of the Interstate Commerce Act, and in which, in consequence, the usual strictness in the construction of the statute as against criminality would be employed, the court, after quoting the provisions of the Elkins Act hereinabove referred to, said:

" * * * We find the word device disassociated from any such words as fraudulent conduct, scheme or contrivance, but the act seeks to reach all means and methods by which the unlawful preference of rebate, concession or discrimination is offered, granted, given or received. Had it been the intention of Congress to limit the obtaining of such preferences to fraudulent schemes or devices, or to those operating only by dishonest, underhanded methods, it would have been easy to have so provided in words that would be unmistakable in their meaning. A device need not be necessarily fraudulent; the term includes anything which is a plan or contrivance. Webster defines it to be 'that which is devised or formed by design; a contrivance; an invention; a project,' etc. * * *

" * * * The Elkins Act proceeded upon broad lines and was evidently intended to effectuate the purpose of Congress to require that all shippers should be treated alike, and that the only rate charged to any shipper for the same service under the same conditions should be the one established, published and posted as required by law. It is not so much the particular

form by which or the motive for which this purpose was accomplished, but the intention was to prohibit any and all means that might be resorted to to obtain or receive concessions and rebates from the fixed rates, duly posted and published. * * *

"* * * Having in view the offense charged in this case, we think it is clearly within the terms of the act making it penal to procure the actual transportation, by any of the means denounced in the act, of goods at a less rate than that named in the tariffs. It is the purpose of the act to punish those who give or receive transportation, in the sense of actual carriage, at a concession from the published rates. * * *

"* * * It is strongly urged that there is nothing in the acts of Congress regulating interstate commerce which can render illegal the contract between the shipper and the railroad company covering the period from June to December, 1905. The contract, it is insisted, was at the legal, published and filed rate, and there is nothing in the law destroying the right of contract so essential to carrying on business such as the petitioner was engaged in. But this contention loses sight of the central and controlling purpose of the law, which is to require all shippers to be treated alike, and but one rate to be charged for similar carriage of freight, and that the filed and published rate, equally known by and available to every shipper.

"In the Elkins Act, Congress has made it a penal offense to give or receive transportation at less than the published rate. This rate can only be raised by ten days' or lowered by three days' notice. Section 6, 25 Stat. 855. There is no provision excepting special contracts from the operation of the law. One rate is to be charged and that the one fixed and published in the manner pointed out in the statute, and subject to change in the only way open by the statute. There is no provision for the filing of contracts with shippers and no method of making them public defined in the statute. If the rates are subject to secret alteration by special agreement then the statute will fail of its purpose to establish a rate duly published, known to all, and from which neither shipper nor carrier may depart.

"It is said that if the carrier saw fit to change the published rate by contract the effect will be to make the rate available to all other shippers. But the law is not limited to giving equal rates by indirect and uncertain methods. It has provided for the establishing of one rate, to be filed as provided, subject to change as provided, and that rate to be while in force the only legal rate. Any other construction of the statute opens the door to the possibility of the very abuses of unequal rates which it was the design of the statute to prohibit and punish.

"Nor do we find anything in the provisions of the statute inconsistent with this conclusion in the fact that the statute makes the rate as published or filed conclusive on the carrier. The carrier files and publishes the rate. It may well be concluded by its own action. But neither shipper nor carrier may vary from the duly filed and published rate without incurring the penalty of the law."

So also in New York, New Haven Railroad v. Interstate Commerce Commission, 200 U. S. 361, 391, 26 Sup. Ct. 272, 277 (50 L. Ed. 515), the court said:

"* * * It cannot be challenged that the great purpose of the act to regulate commerce, whilst seeking to prevent unjust and unreasonable rates, was to secure equality of rates as to all and to destroy favoritism, these last being accomplished by requiring the publication of tariffs and by prohibiting secret departures from such tariffs, and forbidding rebates, preferences and all other forms of undue discrimination. To this extent and for these purposes the statute was remedial and is, therefore, entitled to receive that interpretation which reasonably accomplishes the great public purpose which it was enacted to subserve. * * * If a carrier has a right to disregard the published rates by resorting to a particular form of dealing, it must follow that there is no obligation on the part of a carrier to adhere to the rates, because doing so is merely voluntary. The all-embracing prohibition against either directly or indirectly charging less than the published rates shows that

the purpose of the statute was to make the prohibition applicable to every method of dealing by a carrier by which the forbidden result could be brought about.

" * * * Without a statutory requirement as to publication of rates and the imposition of a duty to adhere to the rates as published, individual action of the shippers as between themselves and in their dealings with the carrier would have full play, and thereby every shipper would have the opportunity to. procure such concessions as might result from favoritism or other causes. * * * "

On page 396 of 200 U. S., on page 279 of 26 Sup. Ct. (50 L. Ed. 515), with reference to the contention advanced by the carrier that in the instance under consideration it had the right to depart from the rates specified in its published tariffs, the court said:

" * * * This simply asserts the proposition which we have disposed of, that a carrier possesses the power, by the form in which he deals, to render the prohibitions of the act ineffective, since it implies the right of a carrier to shut off inquiry as to the real result of a particular transaction on the published rates, and thereby to obtain the power of disregarding the prohibitions of the statute. * * * "

This case is also authority for the proposition (200 U. S. 398, 26 Sup. Ct. 272 [50 L. Ed. 515]), which is of substantial import herein, that the application of the prohibitory features in the Interstate Commerce Act does not depend upon the question of whether the carrier intended to *violate the statute,* but upon the question as to whether the effect of the acts done is to *violate the prohibitions* of the statute.

In American Express Co. v. United States, 212 U. S. 522, 532, 29 Sup. Ct. 315, 317 (53 L. Ed. 635), after citing and quoting from, with approval, the decisions in the New Haven and Armour Packing Cases, supra, the court said:

" * * * But the power of Congress over interstate transportation embraces all manner of carriage of that character—whether gratuitous or otherwise—and, in the absence of express exceptions, we think it was the intention of Congress to prevent a departure from the published rates and schedules in any manner whatsoever. If this be not so, a wide door is opened to favoritism in the carriage of property, in the instances mentioned, free of charge. * * * "

The same court in Union Pacific Railway v. Goodridge, 149 U. S. 680, 691, 13 Sup. Ct. 970, 975 (37 L. Ed. 896), having under consideration the provisions of an act of the state of Colorado not dissimilar to the federal Interstate Commerce Act, said, with respect to a claimed right on the part of the railroad to violate the statutory prohibition against secret departures from the published tariffs, that to uphold such right—

"would open the door to the grossest frauds upon the law, and practically enable the railroad company to avail itself of any consideration for a rebate which it considers sufficient, and to agree with the favored customer upon some fabricated claim for damages, which it would be difficult, if not impossible, to disprove. * * * "

Plaintiff advances the thought that:

"Section 2 of the Commerce Act contains legislative recognition that privileges and concessions may be granted if they do not discriminate against other persons," etc.

If section 2 were the only prohibitory provision of the entire act, plaintiff's contention would probably be well taken, but the other provisions referred to hereinabove are in addition to section 2, and what is of more importance, as I read the occurrences, they were enacted subsequent to the passage of section 2, and largely because it, in consequence of its general tenor, had failed of its full purpose.

The argument is advanced that the prohibitions of section 6 and of the Interstate Commerce Act refer only to freight rates and terminal charges, they being specified in the Act, and that there was no intention to prohibit an abatement of other charges, meaning, that in spite of the provisions of the act, and while the carrier might not suffer an abatement as to any of its freight rates or terminal charges, per se, it might do as it wished with respect to its storage and cartage charges. This contention is to be considered in connection with the further assertion of defendant that:

"None of these local freights, cartage or warehouse charges were incurred or assumed while the shipments affected thereby were in transit for purposes of interstate commerce, but all were intrastate and antedated the inception of any interstate traffic."

For the sake of argument, it might be conceded (although it would seem as if the concession under all the circumstances were a violent one, Daniel Ball, 10 Wall. 557, 19 L. Ed. 999) that the interstate journey of the hops began at San Francisco, the "point of delivery." But this cannot affect the situation. The "regular tariff" which plaintiff's assignors agreed to pay, and in consideration of the payment of which defendant agreed to reimburse said assignors for all local charges, and for excess insurance, was the tariff from this point of delivery to market. It was an interstate tariff. The tariff which was to be abated by the reimbursement of plaintiff's assignors was this interstate tariff and precisely the sort of a tariff which the statute said might not be abated or diminished. It can make no difference what was actually to be done with the money that was to be paid to plaintiff's assignors. This payment when made, as a matter of fact, would serve to reduce the tariff paid by such assignors as for an interstate journey, and it would at the same time serve to violate an express prohibition of the statute. The case would be precisely the same if defendant company instead of agreeing to reimburse plaintiff's assignors for local charges, including cartage and warehousing, had agreed to reimburse them for expenses incurred in the harvesting and curing of their hops, or some other expenditure by them previously made. The violation of the statute results not from a consideration of where the money was to go to, but from where it was to come from. It was to come from a fund which the law said might not be diminished for any purpose. In this view of the case all of defendant's argument with respect to cartage and warehousing being excepted from the provisions of the Interstate Commerce Act fall to the ground. If defendant had agreed to rebate some of the cartage or warehousing charges, this argument would be entitled to consideration.

For similar reasons, cases cited by defendant having to do with cartage charges "after the completion of the interstate journey" (In-

terstate Commerce Commission v. Detroit Railway Co., 167 U. S. 633, 17 Sup. Ct. 986, 42 L. Ed. 306) have no application herein.

In connection with this phase of the case, it might be assumed that it would be competent for a carrier itself to determine precisely what services it would render in performance of an agreement to transport property as between two designated places, and as for a certain specified charge. It may also be assumed, as suggested by defendant, that:

"Patently there are many services which can be rendered, or facilities granted by carriers not embraced within the specific classes enumerated, and publication of which is made mandatory by the act."

Still there is no theory under the act and in recognition of its terms under which there may be a secret agreement, as between the carrier and a shipper, not appearing upon the published schedules, wherein or whereby the carrier may deliberately promise to reimburse the shipper as for his expenditures incurred in the securing of the rendition of such services or facilities, and the effect of which will be to abate the charges specified in the published schedule.

Both plaintiff and defendant concede that the contracts in question would now be invalid under the provisions of the Hepburn law, which went into effect August 29, 1906 (34 Stat. 584, 838), and defendant contends that, as a necessary corollary, they were not invalid previous to the passage of the Hepburn law. Such an inference is too subtle a one for this court to indulge in. The question involved here is not what law may now be in force, but what law was in force, and what is the proper construction to be accorded to it as it was in force, at the time these shipments were actually made. That Congress may have piled "Ossa upon Pelion" in passing the Hepburn law, would in no wise serve to validate that which would have been otherwise invalid under the provisions of the Elkins law.

Defendant finally refers the court to a holding by Judge Van Fleet of this court, rendered in March, 1909, in an action between one Uhlmann and the Atchison, Topeka & Santa Fé Railroad Co., involving substantially the same proposition as is presented herein, and in which, in an unreported decision, Judge Van Fleet held that the claim sought to be enforced did not "constitute, within the meaning of the act, a rebate," and was not "a discrimination between shippers, toward which the provisions of the act are directed." Whereupon counsel for plaintiff is emboldened to suggest, in conclusion, that:

"The passage of the Hepburn Act in 1906, with its all-reaching and far-searching provisions, makes impossible recurrence of litigation such as is involved in the case at bar. The Elkins Act is dead and interesting only as an experimental work in the complete structure—the present Interstate Commerce Act. The decision of this court in the case at bar can and will establish no precedent. The Uhlmann Case has established such precedent."

He who, possessing individual liberty of thought, follows a precedent merely because it is a precedent and in disregard of his own deliberate conclusions, writes himself down not only an intellectual slave, but an intellectual coward as well. A precedent lacking the binding force of authority may be considered because of its persuasiveness, but surely not because of its mere existence.

Judge Van Fleet was long an honored member of our state judiciary, for some time being an incumbent upon our supreme tribunal. My respect for him as a man and as a judge is profound, and has grown with the years of our acquaintance, and in a case involving doubt as to the true course to follow, I would readily yield to his judgment and act in deference to his matured conclusions. In the present instance, however, I cannot bring myself to believe that the contracts in question were not in contravention of the express prohibitions of the Interstate Commerce law as amended by the Elkins Act, and in consequence, loath as I am to differ with him in a matter respecting the proper judicial conclusion to be drawn from the admitted facts, since I cannot escape my individual responsibility in the premises, I am constrained to feel that I ought to assert my individual judgment.

[4] The contracts in question being, in my judgment, contrary to express provisions of law, and opposed to public policy, as the same is declared by the supreme legislative authority of the land, they cannot be enforced in any court. L. & N. Railroad Co. v. Mottley, 219 U. S. 467, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671.

[5] With respect to the unperformed features of the contracts, the court will leave the parties where it finds them, and is compelled, in obedience to the positive mandate of the law, to send plaintiff's assignors forth the victims of their own indiscretion and indulgence. True it is the defendant has money in its hands which it promised to pay over to plaintiff's assignors and which promise, because of motives of obvious propriety on its part, it now stands ready to fulfill if this court will by its protective judgment so decree. But to adjudge plaintiff entitled to recover would be to enforce a contract which the court holds unlawful and unenforceable. The whole spirit and purpose of the Interstate Commerce Act is directed to the end that all shippers shall stand upon an equality in the matter of rates. He who seeks to deviate therefrom does so at his own risk and cannot expect the courts to recoup him any losses he may sustain thereby.

Judgment will be entered in favor of defendant.